A01A1730. BROCK et al. v. WEDINCAMP et al.
A01A1731. WEDINCAMP v. BROCK et al.
(558 SE2d 836)

BARNES, Judge.

We granted these interlocutory appeals to consider the trial judge's partial grant of a motion in limine in this wrongful death case involving evidence regarding the 23-year-old decedent's sex life and gynecological history. Because this evidence is inadmissible, we reverse the trial court's order in Case No. A01A1730 and affirm in Case No. A01A1731.

The decedent and her three-year-old son were passengers in a car involved in a head-on collision. The decedent was killed instantly. The son, through his guardian ad litem, Lynn Brock, sued the drivers of both cars involved: Dana Wedincamp and Edward Smith. The plaintiff filed a motion in limine, seeking to exclude evidence that the decedent had two abortions, gave up two children for adoption, and missed work due to pregnancy, as well as evidence regarding her sex life in general, that her sexual practices could possibly have reduced her life expectancy, and that she had visitation disputes with her ex-husband.

The trial court struggled with this difficult issue, for which little appellate guidance was available. It denied the motion as to evidence that the decedent missed work because she was pregnant, holding that "whether or not she worked is relevant to the economic value of her life."

The court granted the motion regarding the decedent's abortions, adoptions, sex life, custody disputes, and possible reduced life expectancy due to her sexual practices. The trial court commented that if it allowed such evidence, it would arise in every wrongful death action. "Every married man who had a liaison on the side, when he died, the other side would want to come in and say how many women he'd gone to bed with outside of his marriage." The court further held, however, that "should Plaintiff put in evidence that implies or states that Decedent was a good mother or a good person or liked or wanted to work with children, Plaintiff has opened the door for evidence of Decedent's abortions after the birth of [her son] and of the adoptions." The trial judge's stated legal justifications were that (1) a jury could determine that a good mother or person would not become pregnant three times in three years after her son was born; and (2) this evidence may impeach evidence that the decedent was a good mother.

In Case No. A01A1730, the plaintiff appeals the trial court's ruling that the defendants may introduce evidence of the decedent's abortions and adoptions if plaintiff introduces evidence that decedent was a good mother, was a good person, or liked children. The plaintiff also appeals the trial judge's ruling allowing evidence that the decedent missed work because she was pregnant. In Case No. A01A1731, Wedincamp appeals the trial court's ruling making his ability to present this evidence contingent on the plaintiff's introduction of certain evidence, arguing among other things, that "the value of a person's life may be devalued by evidence that she is not highly intelligent," which is demonstrated by the decedent's unwanted pregnancies.

Clearly, none of this evidence is relevant to liability for the collision that caused the decedent's death, so we examine whether it is admissible to prove damages. Our Code provides that the measure of damages in a wrongful death case is "the full value of the life of the decedent, as shown by the evidence." OCGA § 51-4-2 (a). A review of the wrongful death statute's history and case law will aid us in analyzing the meaning of "full value of life," and determining what kind of evidence proves a life's value.

At common law, a person's suit for personal injuries did not survive his death. In 1846, the British Parliament passed Lord Campbell's Act, providing that

> Whenever the death of any person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable if death had not ensued shall be lia-

ble to an action for damages, notwithstanding the death of the person injured. . . .

(Punctuation omitted.) *Thompson v. Watson*, 186 Ga. 396, 397 (197 SE 774) (1938). In other words, the wrongdoer remained liable for damages even after the injured person died, as if the injured person had lived and brought suit on his own behalf.

The Georgia Legislature passed its first wrongful death act in 1850, essentially modeled after Lord Campbell's Act, with the addition of language regarding who was entitled to the proceeds from such an action. *Thompson v. Watson*, supra, 186 Ga. at 397-398. As in the original British act, the Georgia legislation initially did not describe the measure of damages permitted under such an action. Subsequent statutes specifying that railroads can be liable for a wrongful death, describing the acts that give rise to such an action, and delineating who may prosecute the action followed, but the first statutory pronouncement regarding the measure of damages came in 1878, when the legislature specified that the plaintiff "may recover the full value of the life of the deceased, as shown by the evidence." (Punctuation omitted.) Id. at 398.

This description of damages has remained the same ever since. Our current OCGA § 51-4-1 (1) defines "full value of the life of the decedent, as shown by the evidence," as simply "the full value of the life of the decedent without deducting for any of the necessary or personal expenses of the decedent had he lived." Further definition has developed in 120 years of case law.

In the first opinion addressing Georgia's first wrongful death statute, the Supreme Court made the following pronouncement regarding damages:

In any view of the question of damages, something is due, independent of income, for the loss of the care, protection and assistance of the husband and father. Indeed, there are so many elements entering into the account, that in whatever light we look at the subject, we became perplexed in the attempt to pursue it. There must be some latitude left to the soundness of the discretion of the jury, over the subject, as a question of fact. And the greatest, if not the only protection against the abuse of this discretion, must be found in the stern determination of the Courts, not to allow a verdict to stand, which bears the impress upon its face, of passion, partiality, or prejudice.

*South-Western R. Co. v. Paulk*, 24 Ga. 356, 369 (6) (1858).
For some time after *Paulk*, the cases did not discuss the element

of "something due independent of income," but instead discussed what sort of evidence is admissible to determine the loss of the decedent's expected income. One probable reason for this is that the 1858 codification permitted a cause of action only for the death of a husband or father, not for a wife or mother or child. *McDowell v. Ga. R.*, 60 Ga. 320 (1878); *Womack v. Central R. & Banking Co.*, 80 Ga. 132 (5 SE 63) (1887). While a second wrongful death statute in 1856 allowed a child to sue a railroad for the death of either parent, *Atlanta &c. R. Co. v. Venable*, 65 Ga. 55 (1880), the 1863 codification that merged these two statutes only bestowed a cause of action on widows and children. Eldridge's Ga. Wrongful Death Actions (3rd ed.), § 1-10, fn. 11. Not until 1887 did our Code allow a cause of action by a husband or child for the death of a wife or mother. *Thompson v. Watson*, supra, 186 Ga. at 398-399.

Therefore, because the early cases sought damages for the death of a husband or father, most plaintiffs could show some prospective income loss. The Supreme Court in 1868 concluded that the legislature intended to allow only this loss of support as the measure of damages. "Anything more than this, would set us adrift, without chart or compass. The real value of a life[ ] is incalculable, and its actual money-value is all that can be estimated." *Macon &c. R. Co. v. Johnson*, 38 Ga. 409, 434 (3) (1868). Thus the jury was to consider "what would be a reasonable support for the wife, according to the circumstances in life of the husband, as they existed at his death, and as they may be reasonably supposed to exist in the future, in view of his character, habits, occupation, and prospects in life." Id. at 434-435; *Engle v. Finch*, 165 Ga. 131, 133 (139 SE 868) (1927).

Five years after *Engle*, this court found no error in a detailed jury charge instructing the jury on estimating the decedent's lost earnings:

> In ascertaining the amount of damages to be allowed in this case, if you allow any, the jury are not restricted to any fixed rule in the mode of estimating the value of the life of the deceased. The age of the deceased, the health he enjoyed, the money he was making by his labor, his habits, his probable loss of employment, his voluntary abstaining from work, dullness in business, reduction of wages, the increasing infirmities of age, with a corresponding diminution of earning capacity, and other causes which may contribute in greater or less degree to decreasing the gross earnings of a lifetime, may all be considered by the jury in determining the value of the life of the deceased. In estimating damages a proper allowance and deduction should be made in favor of the defendant for any diminution in income from labor

which would have resulted, in your opinion, from any of those causes. In ascertaining the value of the life, you will consider the deceased's age at the time of his death, the length of time he would probably have lived, the amount per annum which he was earning, as such amount may be developed from the evidence before you, and any other facts which will enable you to arrive fairly and impartially, acting under your consciences and your oaths as impartial jurors, at the value of that life.

*Radcliffe v. Maddox*, 45 Ga. App. 676, 685 (5) (165 SE 841) (1932).

A defendant could not show, however, that the family of a man who died while working on a chain gang was more prosperous after his death. *Boswell v. Barnhart*, 96 Ga. 521, 522 (23 SE 414) (1895). Instead, "[t]he age of a man, the health he enjoys, the money he is making by his labor, his habits, are data from which the jury may argue how long he will probably live and work, and what his life is worth to his wife in its pecuniary value." Id. at 524 (4). The jury could consider a decedent's previous earning capacity, expected increases and decreases in earnings, and "his apparent mentality, industry, and other qualities, as disclosed by the evidence." *City of Thomasville v. Jones*, 17 Ga. App. 625, 627 (3) (87 SE 923) (1916). It could consider

the age of the deceased at the time of his death, his health, his habits, the amount of money he was earning, his expectation of life, the probable loss of employment, voluntary abstinence from work, dullness in business, . . . and other causes which may contribute to illustration of the gross earnings of a lifetime.

*Pollard v. Boatwright*, 57 Ga. App. 565, 568 (1) (196 SE 215) (1938).

But measuring wrongful death damages by estimating the decedent's future lost income created a problem when the decedent was an infant, a young person who had not yet begun working, or a woman who did not work outside her home. If the jury considered only lost income, the value of these decedents' lives would be nothing. In 1915, this court addressed that problem. We affirmed a $10,000 verdict when the husband testified that his late wife "did all the house-work, nursed his baby, cooked his food, and did the sewing for the household, and, in addition to all this, helped him in his store," and that it would cost him $766 per year to replace these services. *Standard Oil Co. v. Reagan*, 15 Ga. App. 571, 589-590, 600 (84 SE 69) (1915), overruled on other grounds, *Hodges v. Effingham County*

*Hosp. Auth.*, 182 Ga. App. 173, 178 (7) (355 SE2d 104) (1987). Additionally, the jury could consider

> what the value of many services hardly capable of exact proof might be, measured in the light of their own observation and experience, notwithstanding such elements of loss as manual labor would be subject to estimation by witnesses. When the loss of a wife's services, resulting from a personal injury to her, is to be compensated for, she is not to be treated as an ordinary servant or as a mere hireling. [Cits.] She sustains to her husband and his household a relation special and peculiar. Her place can not be supplied; no other is capable of filling it. Some wives perform manual labor — others do not; yet the husbands of the latter no less than those of the former would certainly be entitled to compensation from wrong-doers for causing inability to perform service.

Id. at 599.

While the court in *Standard Oil* did not use the word "intangible," it began to develop the idea that one's life is worth more than just income loss. The intangible factors that "supplement the economic value to comprise the 'full value of the decedent's life' elude precise definition." *Miller v. Jenkins*, 201 Ga. App. 825, 826 (1) (412 SE2d 555) (1991). More than 50 years after *Standard Oil*, in a case involving the wrongful death of a mother with no earnings record, we noted that "a mother performs services of a peculiar nature which can be performed by no other person and which are invaluable and incapable of exact proof." *City of Macon v. Smith*, 117 Ga. App. 363, 374 (8) (160 SE2d 622) (1968). The value of her services can be determined from "the fact of the relationship and all the facts and circumstances of the family and their living conditions, and from the jurors' own experience and knowledge of human affairs." Id.

Incapable of exact proof as it might be, the idea that the full value of a life includes an "intangible" element is now firmly fixed in our case law. *South Fulton Med. Center v. Poe*, 224 Ga. App. 107, 112 (6) (480 SE2d 40) (1996) ("[T]he full value of the life of the decedent includes both the economic value of the deceased's normal life expectancy and the intangible element incapable of exact proof, such as 'a parent's society, advice, example and counsel.' ").

It is clear, also, that under Georgia's wrongful death statute, damages are measured from the decedent's point of view. A child's right to recover for his mother's death "is a substitution of the [child] in [her] place for the purposes of recovering for the injury inflicted upon [her]." *Atlantic &c. R. Co. v. McDilda*, 125 Ga. 468, 471 (54 SE

140) (1906). See also *Reliance Ins. Co. v. Bridges*, 168 Ga. App. 874, 887 (15) (311 SE2d 193) (1983) (physical precedent only). In other words, the measure of damages is not a son's loss from his mother's absence, but the mother's loss from not being able to raise her son. Further, the wrongful death statute is

> a legislative imposition of a penalty upon the person who causes the death of another by negligence, the penalty to go to the person injured. It is penal in that the measure of the recovery is the full value of the life of the deceased, irrespective of its real value to the person in whom the cause of action is vested.

*Engle v. Finch*, supra, 165 Ga. at 134.

In this context we consider what portion of the contested evidence is admissible to show both the economic and intangible losses experienced from a 23-year-old mother's point of view.

### Case No. A01A1730

1. The plaintiff contends on appeal that the trial court erred in ruling that, if the plaintiff introduces evidence that the decedent was a good mother, was a good person, or liked children, the defendants may then introduce evidence that the decedent had one abortion and gave up two children for adoption after her son was born. The trial court also held that the defendants could not introduce evidence that the decedent had an abortion before her son was born.

We review a trial court's ruling on the relevancy of evidence for abuse of discretion. *Key v. Grant*, 238 Ga. App. 818, 819 (2) (520 SE2d 277) (1999). "The existence of such an abuse may be measured by weighing the challenged evidence's probative value against the risk that its admission misled the jury or created a substantial danger of unfair prejudice or confusion." (Citation omitted.) Id. "No precise and universal test of the relevancy of testimony is furnished by the law. The question must be determined in each case according to the facts of that particular case and in accordance with the teachings of reason and judicial experience." (Citation and punctuation omitted.) *Shelnutt v. Phillips*, 113 Ga. App. 321-322 (1) (147 SE2d 803) (1966).

The damages awarded in a wrongful death case, as discussed earlier, are measured from the decedent's perspective. We have affirmed a trial court's refusal to allow evidence that a decedent had filed for divorce against the plaintiff, "as this evidence could in no way reduce the measure of damages, nor the damages recoverable, as the husband and child are entitled under the statute to recover the full value of the life of the deceased wife and mother; nor was this evidence admissible to disprove" her companionship, love, and affec-

tion for her family. *Wright v. Dilbeck*, 122 Ga. App. 214, 216 (2) (176 SE2d 715) (1970); see also *Cornelius v. Macon-Bibb County Hosp. Auth.*, 243 Ga. App. 480, 486 (3) (533 SE2d 420) (2000) (while evidence of three-month separation admissible to rebut opening statement that decedent and husband "had been together since 1963," evidence of reason for separation inadmissible).

We also reversed a defense verdict in a wrongful death case because of the admission of irrelevant evidence of a relative's crime, holding that "[w]hile the range of proof in determining the full value of a deceased's life is broad, we find no reasonable basis for holding that a decedent's father's and brother's criminal records are relevant to any aspect of such a valuation." *Key v. Grant*, supra, 238 Ga. App. at 819 (2). On the other hand, evidence of the decedent's practice of stepping out in front of cars while intoxicated, which was how she died, was relevant to a determination of her life expectancy as well as to the issue of contributory negligence. *Stripling v. Godfrey*, 143 Ga. App. 742, 743 (2) (240 SE2d 145) (1977) (physical precedent only).

In this case, the evidence Wedincamp seeks to admit is particularly inflammatory. "[I]rrelevant matters which improperly tend to reflect adversely on the victim's character, which destroy a juror's impartiality, or which only excite the passions of the jurors should not be admitted." *Cook v. State*, 232 Ga. App. 796, 797 (1) (503 SE2d 40) (1998). In *Cook*, we affirmed the trial court's exclusion of evidence about the rape victim's proposed abortion, noting that the defendant acknowledged that this issue "is extremely emotional and divisive, and persons with divergent views often become heated over this subject." (Punctuation omitted.) Id. The state agreed that "abortion is one of the most inflammatory issues of our time," and we concluded that "evidence of the abortion only injected an improper element of emotionalism." (Citation and punctuation omitted.) Id.

Further, even if evidence of the decedent's abortions and adoptions and sex life were somehow relevant, courts must consider whether "its probative value is substantially outweighed by the risk that its admission will create substantial danger of undue prejudice or of confusing the issues or of misleading the jury." (Citation and punctuation omitted.) *Metro. Property &c. Ins. Co. v. Shepherd*, 166 Ga. App. 300, 301 (1) (304 SE2d 74) (1983). In this case, we find no abuse of discretion in the trial court's decision to exclude the evidence to which the plaintiff objects, because it would create such a danger.

We are hesitant to give an advisory opinion on what evidence might be admissible to rebut other evidence after a party allegedly opens the door. Nevertheless, we find that it would be an abuse of the trial court's discretion if it allowed Wedincamp to present evidence of the decedent's abortions, adoptions, or sex life merely because the

plaintiff presented some evidence that the decedent "was a good mother, or a good person, or liked or wanted to work with children." Such a decision assumes that this evidence would be inconsistent with being a good mother, a good person, or one who liked or wanted to work with children, and nothing has shown this to be true. In the abstract, we cannot say that evidence of abortions, adoptions, or her sex life would rebut evidence that the decedent was a good person and a good mother to her child. Therefore, absent some proof supporting the trial court's assumption as well as a clear indication that the probative value of the evidence exceeds its prejudicial impact, we find that admitting this evidence in rebuttal on the basis suggested by the trial court would be an abuse of discretion.

Further, "[w]itnesses cannot be impeached by showing their lack of chastity where this bears no relevance to the case." *Smith v. State*, 235 Ga. 327, 328 (2) (a) (219 SE2d 440) (1975). The jury must consider the loss to the decedent of her opportunity to raise her son, not the loss to her son of his mother. Viewed properly from that perspective, evidence that the decedent had one abortion before the birth of her son and one abortion and two full-term pregnancies after his birth is not relevant to show the decedent's loss to herself of her opportunity to be a parent to the son who survived her.

OCGA § 24-2-2 provides that "[t]he general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." As the trial court noted, the defendants in this case would like to mark the decedent with a scarlet letter. The defendants want to unfairly devalue the decedent's life to the jury by focusing on her sex life and sex partners, evidence that is irrelevant to the value of her life to herself. This course of action cannot be condoned.

2. The plaintiff also contends that the trial court erred in denying her motion in limine regarding evidence that the decedent missed work because she was pregnant. The trial court held, "Defendant may show that the reason Decedent was not working from time to time was because of her various pregnancies; the legal justification to allow this information to the jury is the fact she was or was not working is relevant to the economic value of her life."

The plaintiff offered to stipulate that the decedent missed periods of work, but contends that the prejudicial effect of the decedent being pregnant out of wedlock outweighs any probative value gained by telling the jury why she missed work. The defendants respond that if the jury does not know why the decedent missed work, they cannot argue that she might have experienced similar income and job losses in the future and that the jury may properly consider voluntary abstinence from work.

The language concerning "voluntary abstinence" arises in numerous cases regarding jury charges about calculating lost income due either to death or disability. For example, in 1946 this court approved the following charge in a wrongful death case:

In arriving at the gross sum the deceased would have earned to the end of his life had he not been killed, the jury should consider the age of the deceased at the time of his death, his health, possibility of sickness, occupation, habits, and surroundings, the amount of money he was earning, his expectation of life, the probable loss of employment, *voluntary abstinence from work*, dullness in business, reduction of wages, increasing infirmities of age, with a probable corresponding diminution of earning capacity, and any other causes which may contribute to the illustration of the gross earnings of a lifetime.

(Punctuation omitted; emphasis supplied.) *Callaway v. Cox*, 74 Ga. App. 555, 562 (8) (40 SE2d 578) (1946). Voluntary abstinence is thus one of many relevant factors a jury may consider in determining the economic value of a decedent. However, while the reason for the decedent's "voluntary abstinence" from work may be marginally relevant to a determination of her future lost income, based on the record before us, the prejudicial effect of her status as a pregnant unmarried woman clearly outweighs any probative value. Under the evidence existing at the time of the ruling, the trial court abused its discretion in failing to grant the plaintiff's motion to exclude evidence that decedent's pregnancies caused her to miss work.

### Case No. A01A1731

3. Defendant Wedincamp contends that

[t]he trial court abused its discretion in finding that evidence of the decedent's five pregnancies, all of which were conceived outside of marriage, are only relevant to the value of the decedent's life, as they affected her earning ability, intelligence and her character, if . . . any of appellee's witnesses characterize the deceased as a good person or a good mother.

For the reasons set forth in Division 1, the trial court did not abuse its discretion.

4. Defendant Wedincamp contends that the trial court abused its discretion "in refusing to allow Appellant to introduce evidence from the Decedent's physician that the Decedent's promiscuity affected

her mortality." The evidence to which Wedincamp refers consists of the following exchange during a deposition:

Q. All other things being equal, sir, who has a higher mortality rate: A woman who does not have unprotected sex or does have a monogamous relationship, or someone who has frequent unprotected sex with someone other than her husband?
A. Well, the one that would have unprotected sex with multiple partners would be at greater risk.

At the motions hearing, the trial court made the following observations regarding this issue:

I am not going to have [the doctor] tell me that her life — that she has shortened her life by having some extracurricular activities. My Lord, can you imagine? Every wrongful death case now, we're going to go into the sexual activity of every person who's in here. [There is] no way that this Court's going to open that one up. And since this is still what we call, believe it or not, a double-standard community, I am sure the males will applaud that ruling much more than the females before it's over. I can't imagine getting into sexual promiscuity and how it shortens your life in every single wrongful death trial I've got.

The physician's testimony regarding whether, hypothetically, this health issue might have affected someone's longevity was extremely speculative. Without testimony to a reasonable medical certainty that the decedent engaged in conduct that would have shortened her life, the trial court did not abuse its discretion in refusing to admit this evidence.

5. Finally, Wedincamp asserts that the trial court abused its discretion in refusing to allow him to impeach any testimony that the deceased was a good person and good mother with evidence that the decedent hid her son from his father for two years, arguing this evidence is relevant to show the decedent's character. The defendant misapprehends the nature of the damages for a wrongful death. Again, the jury considers the intangible and economic value of the decedent's life from the decedent's perspective, not from her son's perspective. Viewed in this context, the trial court properly excluded evidence regarding the decedent's visitation disputes with her ex-husband.

*Judgment reversed in Case No. A01A1730. Judgment affirmed in Case No. A01A1731. Smith, P. J., and Phipps, J., concur.*

DECIDED JANUARY 15, 2002 —

*Killian & Boyd, Robert P. Killian, Karen M. Krider*, for appellants.

*Forbes & Bowman, Morton G. Forbes, Catherine M. Bowman, Scot V. Pool*, for appellees.