**Jesus CAMACHO, surviving spouse of Stacey Camacho, and LaJean Nichols, as Administratrix of the Estate of Stacey Camacho, Plaintiffs,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

Civil Action No. 1:11–CV–3111–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 31, 2014.

Brandon Cathey, Swope, Rodante, P.A., Tampa, FL, Darrell Wayne Hinson, Swope, Rodante, P.A., Decatur, GA, for Plaintiffs.

Jeffrey Emery Tompkins, Shukura Ingram Millender, Thomas Kennedy Sampson & Tompkins, LLP, Robert Malcolm Darroch, Stephanie F. Glickauf, Goodman McGuffey Lindsey & Johnson, for Defendants.

### ORDER

AMY TOTENBERG, District Judge.

This insurance case arises out of an automobile accident that occurred after Nationwide's insured, Seung Chun Park, ran a red light and struck a car driven by Stacey Camacho, causing her death. Plaintiffs Jesus Camacho, surviving spouse of Stacey Camacho and LaJean Nichols, Administratrix of the Estate of Stacey Camacho, allege that Nationwide negligently and in bad faith failed to accept a demand for settlement of all claims against Park within the policy limits and exposed Park to a $5.83 million excess jury verdict. Fol-

lowing the jury's verdict in the state court wrongful death suit, Park assigned his claims for negligent and bad faith failure to settle against Nationwide to Plaintiffs. This case is before the Court on Defendant Nationwide's Motion for Summary Judgment [Doc. 76] and Motion to Exclude Expert Witness [Doc. 77]. Nationwide seeks summary judgment on the grounds that the undisputed evidence demonstrates that that it acted in good faith and that Plaintiffs' policy-limits demand was not a sufficiently definite settlement offer capable of acceptance. Nationwide also seeks to exclude Plaintiffs' insurance expert from offering an opinion on Nationwide's claims handling at trial. The Court's rulings on Nationwide's motions are set forth below.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." FED.R.CIV.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting the Advisory Committee's note to FED.R.CIV.P. 56). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to establish, by

going beyond the pleadings, that there is indeed a genuine issue as to the material facts its case. *Thompson v. Metro. Multi-List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir.1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' ... [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir. 1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990); *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989). But where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## II. FACTUAL BACKGROUND [1]

### A. Nationwide's Preliminary Investigation

The automobile accident caused by Mr. Park that resulted in the death of Stacey Camacho occurred on July 3, 2005. (Def.'s SMF ¶ 1; Pl.'s Resp. SMF ¶ 1; Compl. ¶ 7.) At the time of the accident, Park was insured under an automobile insurance policy with Nationwide, with policy liability limits of $100,000 per person's bodily injury and $300,000 per accident. (Nationwide Policy No. 70–10–P–456486, Def.'s MSJ App. U, Doc. 76–4, at 202; Pls.' RSMF ¶ 2, Doc. 95–1.) As of July 7, 2005, the claim for damages arising from the accident had been reported to Nationwide and was assigned to Sharon Wilson for adjustment handling. (Dep. Wilson I, at 96, Doc. 83.) Upon assignment, a computer log was created where Wilson "timely record[ed] all activity on [the Stacey Camacho] claim." (*Id.* at 93, 97–98; *see generally* Nationwide Activity Log [hereinafter "Log at [page]"], Def.'s MSJ App. C, Doc. 76–4, at 47, Pls.' Resp. to Def.'s Mot. Summ. J. ("Pls.' RMSJ") Ex. B, Doc 96, at 44.)

On July 8, 2005, Wilson obtained the police accident report. The report indicated that Park had failed to stop for a red light, and had been arrested on suspicion of driving under the influence of alcohol. (Log at NW000367, Docs. 76–4 at 47, 96 at 44.) Wilson made a determination of probable adverse liability to Park, and on July 11, 2005, on behalf of Nationwide she sent Park a letter indicating that he faced potential liability in excess of the policy limits. (Log at NW000352, Docs. 76–4 at 47, 96 at 44; Dep. Wilson I, at 109, Doc. 83; NW 'Excess' Letter to Park dated 7/11/2005, Def.'s MSJ App. E, Doc. 76–4, at 70.)

Wilson met with Stacey's husband, Jesus Camacho ("Camacho"), and her mother LeJean Nichols, at Nichols' home. (Dep. Wilson I, at 100, Doc. 83; Dep. LeJean Nichols, at 17, Def.'s MSJ App. F, Doc. 76–4, at 71.) The purpose of this meeting was for Wilson "to introduce [herself] as the claims representative that was assigned to handle the claim and explain the claims process," as well as to secure further information as part of her preliminary investigation of the claim. (Dep. Wilson I, at 100, Doc. 83.) Wilson learned that Stacey's vehicle was insured with GEICO with underinsured motorist coverage of $50,000 per person and $100,000 per accident. (Def.'s SMF ¶ 11, Doc. 76–1; Pls.' RSMF ¶ 11, Doc. 95–1.) Wilson determined that Stacey's underinsured motorist coverage with GEICO did not apply in this case because it did not exceed Park's liability coverage. (Def.'s SMF ¶ 13, Doc. 76–1; Pls.' RSMF ¶ 13, Doc. 95–1.) At the conclusion of her preliminary investigation, Wilson determined that the value of the

---

1. Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual findings of fact. *Priester v. City of Riviera Beach,* 208 F.3d 919, 925 n. 3 (11th Cir.2000) ("We ... have repeatedly stressed that the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case."). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

claim exceeded Park's $100,000 policy limit. (Dep. Wilson I, at 116, Doc. 83.)

## B. Nationwide's Initial Settlement Discussions

On August 25, 2005, Wilson prepared a request for a $100,000 pre-settlement authorization from her supervisor "to tender limits to spouse or [attorney] in exchange for a General Release . . . [with] [p]ayment [to] include the Estate Claim and the Wrongful Death Claim." (*Id.* at 116–118; Log at NW000299–300., Docs. 76–4 at 47, 96 at 44.) Wilson did not receive a response to this request. (Dep. Wilson I, at 118, Doc. 83.)

On August 26, 2005, Wilson wrote a letter to Nichols asking for "[c]opies of the related Medical bills for [ ] Stacey," "[a] copy of the certificate of death," and "[a]ny medical lien or subrogation letters from Peach Care of BCBS." (NW Letter to Nichols dated 8/26/2005, Def.'s MSJ App. I, Doc. 76–4, at 91.)

On October 24, 2005, Wilson again requested pre-settlement authorization approval from her supervisor, Mitch Parham. (Log at NW000283, Docs. 76–4 at 47, 96 at 44.) The authorization request lists the liability as "clear," and notes under "SPECIAL DAMAGES" that the "family is presenting a wrongful death claim" with "[n]o [attorney] involved," and itemizes the hospital bill as "$54,186.00" and the funeral bill as "$5,723.70" for a total estate claim of "59,909.00 [sic]." (*Id.*) Finally, the request lists a "[h]ospital lien filed $6,573.00, to be protected" as well as a notation that the "[f]amily reports that some of the medical bills were paid by group health." (*Id.*) On October 27, 2005, Wilson's supervisor, Mitch Parham, reviewed the request and commented: "25 year old driver and fatality on this case with punitive concerns. agree limits case. you will need to protect liens and verify marriage. sending noa to director for auth." (Log at NW000282, Docs. 76–4 at 47, 96 at 44.) That same day, the request for settlement authority was approved. (Def.'s SMF ¶ 18, Doc. 76–1; Pls.' RSMF ¶ 18, Doc. 95–1.)

Wilson "followed up with Mrs. Nichols and Jesus Camacho, Stacey's husband, in November 2005 to discuss settlement. However they indicated they were not ready to discuss settlement at that time." (Aff. Wilson, Def.'s MSJ App. D, Doc. 76–4, at 60.) [2]

In February 2006, Wilson reached out to Nichols and Camacho, and scheduled a meeting at her office for February 13, 2006. (Log at NW000280, Docs. 76–4 at 47, 96 at 44, Docs. 76–4 at 47, 96 at 44.) At that meeting, Wilson presented Nichols and Camacho with a check for $97,000 in exchange for a general release. (Dep. La-Jean Nichols, at 22, Def.'s MSJ App. F, Doc. 76–4, at 71; Dep. Wilson I, at 123, Doc. 83.) Wilson explained that the remainder of $3,000 would be used by Nationwide to pay Stacey's outstanding hospi-

**2.** Plaintiffs object to Nationwide's assertion of this fact, however they fail to support their objection with "specific citations to evidence" which "directly refutes the [Nationwide]'s fact." LR 56.1B(2)(a)(2)(ii), NDGa. The Court acknowledges Plaintiffs' argument that "[n]o entry of such a follow up discussion in November of 2005 is recorded by Ms. Wilson in the claims activity log, despite Ms. Wilson's deposition testimony that she timely records all activity on a claim in her log." (Pls.' RSMF ¶ 19, Doc. 95–1 (citing Dep. Wilson I, at 97–98, Doc. 83).) However, long before her swearing her affidavit, on February 8, 2006, Wilson noted in the claim log that "[n]ow that the holidays are over, [Stacey's] family [is] ready to discuss settlement." (Log at NW000280, Docs. 76–4 at 47, 96 at 44.) The Court could infer from this that she did make the call and failed to record it in the log, or the Court could determine that she did not make the phone call. The Court will not reach this issue, however, as the dispute of fact is not material.

tal bills.[3] (Def.'s SMF ¶ 22; Pl.'s Resp. SMF ¶ 22.) Nichols and Camacho decided to consult with an attorney before accepting the offer. (Def.'s SMF ¶ 23, Doc. 76–1; Pls.' RSMF ¶ 23, Doc. 95–1.)

On March 2, 2006, Attorney Charles McAleer sent Wilson two letters notifying Nationwide that he represented Camacho and the Estate of Stacey Camacho. (McAleer Letters to NW dated Mar. 2, 2006, Def.'s MSJ App. K, Doc. 76–4, at 98–99.) Neither letter contained an offer of settlement. (*Id.*)

On March 28, 2006, Wilson and McAleer discussed settling both the estate and wrongful death claims against Park for the policy limits over the phone. (Dep. Wilson II, at 14–15, Doc. 89.) Wilson "explained [Nationwide would] pay $100,000.00 in exchange for a full release." (*Id.*) McAleer indicated his clients would settle at the policy limits for a limited liability release only, and that he planned to make a time-limited demand for such. (Log at NW000266, Docs. 76–4 at 47, 96 at 44.)

Following their conversation, Wilson sent McAleer a letter dated March 28, 2006, which reiterated Nationwide's prior settlement offer as follows:

> Prior to your representation, I had tendered the $100,000.00 liability limits in exchange for a general release which will only release the named parties. This offer is made on behalf of the Estate Claim and the wrongful death claim of Stacey Camacho. This offer is inclusive of any outstanding medical liens. If an Estate is set up, I will need a copy of the legal documents."

---

**3.** On February 8, 2006, Wilson contacted the attorney in charge of collecting the hospital balance to determine the hospital lien status, having been told by "[claimant's] family" that the "bill [was] paid by BCBS." (Log at

(NW Letter to McAleer dated Mar. 28, 2006, Def.'s MSJ App. M, Doc. 76–4, at 109.)

### C. McAleer's April 18, 2006 Letter

McAleer sent Wilson a letter dated April 18, 2006 by certified mail, which Wilson received on April 20. (McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 110; Log at NW000264, Docs. 76–4 at 47, 96 at 44.) The demand letter's subject line defined "our client" as "Jesus Camacho, the Estate of Stacey Camacho." (*Id.*) The letter stated that MacAleer was retained to represent "Jesus Camacho in relation the [sic] wrongful death of Stacey Camacho [and] the Estate of Stacey Camacho relating to injuries to Stacey Camacho sustained as a result of the above-referenced collision." (McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 110.) McAleer's letter outlined the legal basis for liability against Nationwide's insured, Mr. Park, and contained a demand for "the policy limit of $100,000.00 for [his] clients." (*Id.*) The letter enumerated "Damages Incurred" under three categories: (1) "Special Damages, Estate claim" for the medical expenses incurred related to Stacey Camacho's physical injuries; (2) "General Damages" suffered by Stacey Camacho's survivors due to her death; and (3) "Punitive Damages." (*Id.*) After listing the damages, the letter contained an "offer to settle the claim of Jesus Camacho for the policy limits of $100,000.00. . . . We make this good faith offer to settle all claims within a reasonable time." (*Id.*)

The letter further explained procedures for acceptance, requiring that "[t]he settlement draft [ ] be issued only in the names

NW000280, Docs. 76–4 at 47, 96 at 44.) Based on Wilson's conversation with the attorney, it was her understanding that no lien was filed. (*Id.* at NW000279.)

of Jesus Camacho and Charles McAleer, Attorney at Law" and that "settlement proceeds [ ] be held in trust until all necessary court approvals are obtained for the settlement of The Estate of Stacey Camacho...." (*Id.*) The letter specified that "[a]ny settlement is contingent upon my approval of the language of the release to be signed only by Jesus Camacho" and that Camacho "*will sign only a limited release.*" (*Id.* (emphasis in original).) The letter states that the demand was "open for ten (10) days" and requested that Nationwide "tender any payment within ten (10) days of today's date." (*Id.*)

### D. Nationwide's Response to the April 18, 2006 Settlement Demand

Wilson's claim log on May 1, 2006 indicates that Nationwide received McAleer's settlement demand on April 20, 2006. (Log at NW000264, Docs. 76–4 at 47, 96 at 44.) According to Wilson's entry, the letter expired on May 1, 2006. (*Id.*) Wilson calculated that date based on "[t]en days from the date [the letter was] received." (Dep. Wilson II, at 22, Doc. 89.) The entry notes that Wilson is "[u]nable to agree to terms of settlement, demand limited release. NW requesting general release." (Log at NW000264, Docs. 76–4 at 47, 96 at 44.)

On May 1, 2006, Wilson met with Parham and Nationwide's in-house legal counsel Russ Roddy. (Dep. Wilson II, at 58, Doc. 89.) At the meeting, Wilson, Parham, and Roddy discussed McAleer's April 18, 2006 letter, and determined that they would accept McAleer's settlement at policy limits but only for a "full release." (*Id.* at 58–60; Log at NW000263–264, Docs. 76–4 at 47, 96 at 44.) Additionally, they determined that they needed clarification as to whether an estate was set up before issuing the $100,000 settlement check.

(Log at NW000263, Docs. 76–4 at 47, 96 at 44–264.)

That same day, Wilson sent McAleer a letter acknowledging receipt of the time-limited demand and outlining Nationwide's position. (Log at NW000263, Docs. 76–4 at 47, 96 at 44; NW Letter to McAleer dated May 1, 2006, Def.'s MSJ App. O, Doc. 76–4, at 115.) Nationwide's May 1, 2006 response letter noted that McAleer's "demand included a request for a Limited Release" and that Nationwide's "investigation shows that a Limited Release is not applicable in this case." (NW Letter to McAleer dated May 1, 2006, Def.'s MSJ App. O, Doc. 76–4, at 115.) The letter continued that "Nationwide has tendered it's [sic] limits and is prepared to issue the settlement check upon acceptance of a general release and documentation that your client was legally married to the deceased at the time of this accident." (*Id.*) Finally, Wilson requested clarification as to the estate status and McAleer's tax identification number. (*Id.*) Attached to the letter was a blank General Release form to be completed by "Jesus Camacho, Individually and as the Administrator of the Estate of Stacey Camacho." (*Id.*)

On May 1 and 4, 2006, Wilson had brief phone conversations with Park to discuss the status of the claim. (Log at NW000263–264, Docs. 76–4 at 47, 96 at 44) Subsequently, on May 5, 2006, Wilson spoke with Park's criminal defense attorney Kip Shepherd about the issues surrounding McAleer's demand and the type of release. (*Id.* at NW000262–263.) On May 16, Shepherd informed Wilson over the phone that Mr. Park would accept a limited liability release to settle the claim. (Def.'s SMF ¶ 50, Doc. 76–1; Pls.' RSMF ¶¶ 50, Doc. 95–1.) The next day, Wilson confirmed in writing her conversation with Shepherd that Park had no objection to a Limited Release. (*Id.* at NW000261; NW

Letter to Kip Shepherd dated May 17, 2006, Def.'s MSJ App. AA, Doc. 76–5, at 73.)

Meanwhile, on May 12, Wilson attempted to reach McAleer over the phone and left a message with his paralegal. (Dep. Wilson III, at 35–36, Doc. 91.) She also confirmed these efforts in a letter the same day to McAleer and reiterated Nationwide's settlement position. (NW to McAleer dated May 12, 2006, Def.'s MSJ App. Z, Doc. 76–5, at 72.)

On June 9, 2006, over three weeks after receiving approval from Park, Wilson informed McAleer in writing that Park had authorized Nationwide to settle for a limited release. (NW to McAleer dated June 9, 2006, Def.'s MSJ App. BB, Doc. 76–5, at 74; Log at NW000261, Docs. 76–4 at 47, 96 at 44.) On June 26, 2006, Wilson received a fax from McAleer that Nationwide's May 1, 2006 proposal was "under consideration." (Log at NW000259, Docs. 76–4 at 47, 96 at 44; Pls.' RMSJ Ex. W, Doc 98, at 83.)

McAleer filed suit on Plaintiffs' behalf against Park on July 25, 2006. (Def.'s SMF ¶ 56, Doc. 76–1; Pls.' RSMF ¶ 56, Doc. 95–1.) On October 18, 2009, the State Court of Fulton County entered judgment on a $5.83 million jury verdict against Park. (*Nichols v. Park*, No. 06–EV–000714D (Ga.State Ct. October 18, 2009), Compl. Ex. A, Doc. 1–1.) On June 28, 2011, Park assigned his claims against Nationwide to Plaintiffs. (Assignment Agreement, Compl. Ex. B, Doc. 1–2.)

### III. ANALYSIS

#### A. Motion for Summary Judgment

The Georgia Supreme Court has held that an insurance company "may be liable for an excess judgment entered against its insured" if it "acts in bad faith in refusing to settle a personal claim against its insured within the policy limits." *Fortner v. Grange Mut. Ins. Co.*, 286 Ga. 189, 686 S.E.2d 93, 94 (2009) (citing *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 580 S.E.2d 519 (2003)). In determining whether the insurer acted in bad faith, it is "[j]udged by the standard of the ordinarily prudent insurer." *Brightman*, 580 S.E.2d at 521. The insurer's failure to settle is in bad faith "if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk." *Id.* The rationale behind allowing these bad faith claims is that "the interests of the insurer and insured diverge when a plaintiff offers to settle a claim for the limits of the insurance policy. The insured is interested in protecting itself against an excess judgment; the insurer has less incentive to settle because litigation may result in a verdict below the policy limits or a defense verdict." *Id.*

When presented with a settlement offer within policy limits, an insurer must "act[ ] reasonably in responding to [the offer]," and rest its decision of whether to settle on "equal consideration to the interests of the insured." *Id.* at 521; *S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 416 S.E.2d 274, 276 (1992). Whether the insurer had an opportunity to make an effective compromise is sometimes a factual issue. *Brightman*, 580 S.E.2d at 521. The Georgia Supreme Court explained in *Holt* that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney," but that a jury question on the reasonableness of the insurer's actions arose when an insurance company failed to "respond to a deadline to settle a claim within policy limits *when the company [had] knowledge of clear liability and special damages exceeding the policy ˈlimits.*" *Holt*, 416 S.E.2d at 276 (emphasis in origi-

nal); *see also Dickerson v. Am. Nat'l Prop. & Cas. Co.,* No. 3:07–CV–111, 2009 WL 1035131, at *6–8(I) (M.D.Ga. April 16, 2009) (applying *Holt* and holding that question of fact existed as to whether insurance company acted in bad faith when it requested medical records and did not accept settlement demand after receiving sufficient documentation to show that damages exceeded policy limit); *Hulsey v. Travelers Indem. Co. of Am.,* 460 F.Supp.2d 1332, 1335 (N.D.Ga.2006) (applying *Holt* and holding that although insurance company claimed it did not make payment due to a question regarding extent of coverage, plaintiff presented evidence that the company knew or should have known the answer to the question, which was sufficient to reach a jury on the question of bad faith failure to settle). "The jury generally must decide whether the insurer, in view of the existing circumstances, has accorded the insured 'the same faithful consideration it gives its own interest.'" *Holt,* 416 S.E.2d at 276 (citing *Great American Insurance Co. v. Exum,* 123 Ga.App. 515, 181 S.E.2d 704 (1971); *U.S. Fidelity & Guaranty Co. v. Evans,* 116 Ga.App. 93, 156 S.E.2d 809 (1967), *aff'd,* 223 Ga. 789, 158 S.E.2d 243 (1967)).

It is undisputed that Nationwide had knowledge of "clear liability and special damages exceeding the policy limits." *See id.* (Log at NW000282–283, Docs. 76–4 at 47, 96 at 44.) If Nationwide "had tendered its policy limits while the plaintiff's offer was pending, it would have done everything within its control to accept the plaintiff's offer and thus protect its policyholder from an excess verdict. In that situation, the insurance company would have given equal consideration to its insured's financial interests and fulfilled its duty to [him]." *See Brightman,* 580 S.E.2d at 522. It is also undisputed that Nationwide did not settle with Plaintiffs in

response to their time-limited settlement offer for the policy limits. Nationwide nevertheless argues that it is entitled to summary judgment for four reasons.

First, Nationwide asserts that its attempts to settle for the policy limits *prior* to Plaintiffs' settlement demand in combination with Plaintiffs' counsel's response agreeing only to a limited release, and Stacey Camacho's outstanding medical bills, and funeral expenses create a "safe harbor" from liability under *Holt.* (Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br. MSJ"), at 14, Doc. 76–2 (citing *S. Gen. Ins. Co. v. Wellstar Health Sys., Inc.,* 315 Ga. App. 26, 726 S.E.2d 488, 492 (2012).)) Second, Nationwide argues that the Plaintiffs' settlement demand through counsel was not a legally acceptable offer, rendering settlement impossible and thus undermining Plaintiffs' claim for bad faith failure to settle. (*Id.* at 15 (citing *Gov't Employees Ins. Co. v. Gingold,* 249 Ga. 156, 288 S.E.2d 557, 558 (1982).)) Third, Nationwide contends that as a matter of law, the purported ten-day time frame for responding to Plaintiffs' settlement demand was "unreasonably short under these circumstances" and therefore Nationwide lacked an effective opportunity to compromise. (*Id.* at 19–20 (citing *Baker v. Huff,* 323 Ga.App. 357, 747 S.E.2d 1, 9 (2013), *cert. denied,* No. S13C1799 (Ga. Feb. 24, 2014)).) Fourth, Nationwide asserts that because a general release provides greater protection to the insured than a limited release, Nationwide's insistence on a general release not only gave Park's interests equal consideration, but "put Park's interests ahead of its own." (*Id.* at 23.) The Court addresses each argument in turn.

### 1. Applicability of a "Safe Harbor"

Perhaps recognizing the potential for injustice posed by the Hobson's choice insurers face when presented with a policy-limits demand, Georgia courts have cut

back on *Holt's* imposition of excess liability by crafting specifically tailored "safe harbors" from its reach. *Wellstar*, 726 S.E.2d at 495 (2012); *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 580 S.E.2d 519, 522 (2003).

■ One such safe harbor applies to settlement offers that require a condition beyond an insurer's control to occur. *Brightman*, 580 S.E.2d at 520, 522. In *Brightman*, a case involving two insurance companies, an insurer was presented with a policy-limits demand for a settlement of claims contingent on the other insurer also tendering its limits. *Id.* at 520. The Georgia Supreme Court held that in such a situation, "[an] insurer[ ] can create a safe harbor from liability for an insured's bad faith claim under *Holt* by meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured." *Id.* at 522. In such a situation, even if settlement does not occur, the insurer is protected from liability under *Holt* for any excess judgment. *Id.*

■ A second safe harbor protects insurers from a potential dilemma between conflicting statutory and common law duties. *Wellstar*, 726 S.E.2d at 493–94. In *Wellstar*, an insurer argued that its common law duty to accept a policy-limits demand under the conditions outlined in *Holt* conflicted with its statutory duty under O.C.G.A. § 44–14–470 to satisfy hospital liens, with a result that the insurer may be forced "to pay in excess of its contractually agreed policy limits because it cannot both unconditionally accept a time limit demand, and satisfy the statutorily enforced hospital lien." *Id.* at 491 (internal quotations omitted). The Court of Appeals disagreed, holding that an insurer is protected from liability under *Holt* if "(1) the insurer promptly acts to settle a case involving clear liability and special dam-

ages in excess of the applicable policy limits, and (2) the *sole* reason for the parties' inability to reach a settlement is the plaintiff's unreasonable refusal to assure the satisfaction of any outstanding hospital liens" from the proceeds of the settlement. *Id.* at 493 (emphasis in original). The Court in turn determined that the insurance company could have satisfied its good faith obligation by verifying the validity of outstanding liens and by making payment on such as well as tendering payment on the remainder of the policy limits to the injured complainant. *Id.* at 495.

Neither safe harbor applies in the instant case. First, the primary obstacle to settlement was the provision of a limited release, a matter firmly within Nationwide's control. *Brightman*, 580 S.E.2d at 522. (Dep. Wilson II, at 58, Doc. 89; Log at NW000263–264, Docs. 76–4 at 47, 96 at 44.) Even assuming Nationwide needed approval from Park to accept the limited release, it is undisputed that Nationwide did not request such approval until after the 10–day policy-limits demand expired nor did it request an extension of time from Plaintiffs' counsel to enable it to confer with Park, although it had known of Plaintiffs' position regarding the limited release for weeks prior to Plaintiffs' formal demand letter. (Def.'s SMF ¶¶ 26, 50, Doc. 76–1; Pls.' RSMF ¶¶ 26, 50, Doc. 95–1.) This was a matter subject to Nationwide's control. Timely response was particularly essential in the context of a case where "the insurer had knowledge of its clear liability and damages exceeding the policy limits, as in the instant case." *Holt*, 416 S.E.2d at 276.

Second, Plaintiffs' refusal of Nationwide's tender subject to a general release does not insulate Nationwide from liability. Nationwide argues that "[i]f failure to come to terms on hospital liens is a legitimate safe harbor [under *Wellstar* ], the

issues in this case, which include liens *and* other matters also qualify as a 'safe harbor.'" (Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br. MSJ") 14, Doc. 76–2 (emphasis in original).) Nationwide attempts to stretch *Wellstar* beyond its breaking point.

The Court in *Wellstar* explicitly and repeatedly emphasized that the safe harbor it had created applied only when "the *sole* reason for the parties' inability to reach a settlement is the plaintiff's unreasonable refusal to assure the satisfaction of any outstanding hospital liens." *Wellstar*, 726 S.E.2d at 493 (emphasis in original); *see also id.* at 494 ("[W]hen the failure to settle a *Holt*-scenario claim is based *solely* on the plaintiff's unreasonable refusal to ... assur[e] that any hospital liens will be satisfied from the settlement proceeds, that cannot, as a matter of law, constitute a bad faith failure to settle ...." (emphasis in original)). In the instant case, the central settlement hurdle was based on the Plaintiffs' rejection of a general release, and in any case Nationwide did not request clarification of whether the settlement would be inclusive of any hospital liens in its May 1, 2006 response letter. (NW Letter to McAleer dated May 1, 2006, Doc. 97.) Thus, *Wellstar* does not apply.

In sum, Nationwide's attempt to tender the policy limits under its own terms prior to receiving McAleer's demand are insufficient for the Court to hold that it did not act in bad faith as a matter of law. The Court next turns to the enforceability of the policy-limits demand.

### 2. Definiteness of Offer

▉ Nationwide next argues that the offer was legally incapable of acceptance. (Def.'s Br. MSJ 15, Doc. 76–2.) In response, Plaintiffs assert that the offer was sufficiently definite to be capable of acceptance and enforcement. (Pls.' Resp. Def.'s Mot. Summ. J. (Revised) ("Pls.' Resp. MSJ") 9, Doc. 99.)

▉ Under Georgia law an "'excess liability action ... is premised on the possibility of settlement,'" and therefore Plaintiffs must "[a]t a minimum, ... show that settlement was possible." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1550 (11th Cir.1991) (quoting *Gingold*, 288 S.E.2d at 558). Accordingly, Plaintiffs' offer must have been "capable of acceptance.... [I]f the offer [was] in any case so indefinite as to make it impossible for a court to decide just what it means, and to fix the legal liability of the parties, its acceptance [could] not result in an enforceable agreement," rendering settlement impossible. *Herring v. Dunning*, 213 Ga.App. 695, 446 S.E.2d 199, 202 (1994) (quoting *Poulos v. Home Fed. S & L Assn.*, 192 Ga.App. 501, 385 S.E.2d 135 (1989) (internal quotations omitted)).

Nationwide asserts that it "cannot be held liable for failure to settle because settlement upon the terms in McAleer's [April 18] demand letter was legally impossible." Nationwide asserts that the demand letter confusingly contained, not only an offer to "settle all claims" against Park, but also "an offer to settle only one claim" and another offer to settle a different claim. It then argues that it "could not ascertain whether [the demand] was an offer to settle the wrongful death claim [of Plaintiff Jesus Camacho], the estate claim [of Plaintiff LaJean Nichols], or both." (Def.'s Br. MSJ 16, Doc. 76–2; Reply Supp. Mot. Summ. J. ("Reply MSJ") 5, Doc. 101.) Nationwide bases this argument principally on the fact that while the letter separately references Jesus Camacho and the Estate of Stacey Camacho as McAleer's clients and enumerates damages belonging to each entity under separate headings, the letter states in summary that it is an "offer to settle the claim of Jesus

Camacho for the policy limits of $100,000.00." (McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 110.) Additionally, while the letter indicates that it is a "good faith offer to settle all claims within a reasonable time," the demand requires that "[t]he settlement draft [ ] be issued only in the names of Jesus Camacho and Charles McAleer, Attorney at Law," and notes that "[a]ny settlement is contingent upon [McAleer's] approval of the language of the release to be signed only by Jesus Camacho." (*Id.*) The letter also indicates that "settlement proceeds will be held in trust until all necessary court approvals are obtained for the settlement of The Estate of Stacey Camacho," however as Nationwide points out, "Jesus Camacho was not the administrator of Stacey's estate." (*Id.*; Def.'s Br. MSJ 16, Doc. 76–2 (citing Dep. McAleer, at 53, Doc. 52).)

 Plaintiffs first attack Defendant's position by arguing that Nationwide is judicially estopped from asserting that the demand letter was vague and did not contain an enforceable offer based on Nationwide's Answer admitting Complaint Paragraph 18. Nationwide's Answer unequivocally admitted that the April 18 letter containing the policy-limits demand "contained an offer to settle all claims against Park arising from the death of Stacey Camacho with a limited liability release … in exchange for a payment of the $100,000 policy limits…." (Pls.' Resp. MSJ 9, Doc. 99; Compl. ¶ 18, Doc. 1; Answer ¶ 18, Doc. 5.) The Complaint allegation can be construed as a factual one, simply stating that the demand letter offered to settle any and all claims whatsoever against Park arising from the death of Stacey Camacho—whether on behalf of the estate or a wrongful death claim on behalf of the decedent. If Paragraph 18 is construed in this manner, Nationwide's An-

swer would be a binding admission that it could not now avoid. *Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir.1983); *Columbus Bank and Trust Co. v. McKenzie Trucking & Leasing, LLC,* 2009 WL 3526648 at *3 (M.D.Ga., Oct. 23, 2009) (Land, J.). On the other hand, Nationwide may have construed Paragraph 18 as requiring it simply to admit or deny whether it received a demand letter on April 18th of the general nature referenced in this paragraph and assumed that an admission would not acknowledge the scope of the claims asserted by Plaintiffs. While the Court recognizes the merits of Plaintiffs' position, this is not a case such as *Columbus Bank & Trust Co.,* where the Complaint allegation required simply to either admit or deny he was a guarantor of the note at issue. The Defendant here should have admitted in part and denied in part Paragraph 18 if it indeed viewed the April 18th letter as failing clearly to seek to settle all estate and wrongful death claims against Park. However, as the Court finds that the Defendant's narrow interpretation of what it was admitting is not entirely unreasonable, the Court is not prepared to apply judicial estoppel as a matter of law under these circumstances. That said, evidence of Nationwide's Answer may properly be presented to the jury as evidence that Nationwide in reality understood that the Plaintiffs' settlement demand offered to settle all potential claims against Mr. Park, including the "survival" claim of the estate and the wrongful death claim filed by Jesus Camacho on behalf of the decedent individually.

 The Court next examines whether the content of the letter was so confusing or insufficient as to render it incapable of acceptance as a matter of law. To assess this, the Court first looks at the types of recovery sought by Plaintiffs

based on Stacey Camacho's death. An individual's claim for wrongful death and an estate's claim for the decedent's pain and suffering are distinct causes of action. *Smith v. Mem'l Med. Ctr., Inc.,* 208 Ga. App. 26, 430 S.E.2d 57, 59 (1993) (citing O.C.G.A. §§ 51–4–2(a), 51–4–5(b) and *Complete Auto Transit, Inc. v. Floyd,* 214 Ga. 232, 104 S.E.2d 208 (1958)). There are two types of damages at issue in wrongful death cases: "survival" damages and "wrongful death" damages. *Carroll Fulmer Logistics Corp. v. Hines,* 309 Ga.App. 695, 710 S.E.2d 888, 890–91 (2011); *see also Moore v. Mylan Inc.,* 840 F.Supp.2d 1337, 1353 (N.D.Ga.2012) (plaintiffs may maintain separate claims for wrongful death and pain and suffering; the wrongful death claim is brought on behalf of plaintiff individually and the pain and suffering claim is brought on behalf of the estate) (citing *Smith v. Mem'l Med. Ctr., Inc.,* 208 Ga.App. 26, 430 S.E.2d 57 (1993)); *Davenport v. Ford Motor Co.,* 1:05–CV–3047–WSD, 2007 WL 4373601 (N.D.Ga. Dec. 12, 2007) (Duffey, J.) (Wrongful death damages do not include damages for pain and suffering, which are appropriately pursued in a survival action) (citing *Blackstone v. Blackstone,* 282 Ga.App. 515, 639 S.E.2d 369, 372 n. 5 (2006)).

Georgia law provides a method for the recovery of wrongful death damages and a method for the separate recovery of damages for the decedent's pre-death pain and suffering. *Carroll Fulmer Logistics Corp. v. Hines,* 309 Ga.App. 695, 710 S.E.2d 888, 890–91 (2011). Under Georgia's Wrongful Death Act, O.C.G.A. § 51–4–1 et seq., damages are measured from the decedent's point of view; the decedent's representative is authorized to recover for the full value of the life of the decedent. O.C.G.A. §§ 51–4–1; 51–4–2(a); *Brock v. Wedincamp,* 253 Ga.App. 275, 558 S.E.2d 836 (2002). On the other hand, the Georgia survival statute, O.C.G.A. § 9–2–41,

provides that the decedent's personal representative has the right to recover separate damages for the decedent's pre-death physical and mental pain and suffering. *Carroll Fulmer Logistics Corp. v. Hines,* 710 S.E.2d at 891.

While McAleer's letter is not a model of clarity, when read as a whole against this legal backdrop of the dual-damages claims process in wrongful death cases, the Court cannot say that it is so vague as to be unenforceable. The letter clearly states that it is written on behalf of "Mr. Jesus Camacho in relation to the wrongful death of Stacey Camacho" and "the Estate of Stacey Camacho relating to the injuries to Stacey Camacho as a result of the [ ] collision]" and sets out separate categories of special, general, and punitive damages. (Doc. 76–4 at 110.) Although the letter subsequently appears to inconsistently state that it is an "offer to settle the claim of Jesus Camacho" and an "offer to settle all claims," the Court may logically infer from the plain language of the letter, supplemented by the parties' course of conduct and their discussions regarding settlement of *all* claims against Park, that the Plaintiffs were operating on the assumption, at the time, that Jesus Camacho would be appointed administrator of Stacey Camacho's estate. McAleer's recognition of the contingency of this appointment is shown by his requirement that "settlement proceeds [ ] be held in trust until all necessary court approvals are obtained for the settlement of The Estate of Stacey Camacho." (McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 113.) This interpretation is bolstered by Nationwide's own understanding reflected in its May 1 letter, which did not contain a request for clarification as to which claims were covered, but did contain a form General Release to be signed by "Jesus Camacho, Individually and as the

Administrator of the Estate of Stacey Camacho." (NW Letter to McAleer dated May 1, 2006, Def.'s MSJ App. O, Doc 76–4, at 115.)

Nationwide attempts to counter this interpretation by noting that "Jesus Camacho was not the administrator of Stacey's estate," and that McAleer could not "represent that Jesus Camacho would be appointed Administrator of the Estate by an unknown Probate Court Judge." (Def.'s Br. MSJ 16–17, Doc. 76–2 (citing Dep. McAleer, at 53, Doc. 52).) While Jesus Camacho was not ultimately appointed Administrator of Stacey Camacho's estate,[4] this eventuality has no bearing on the parties' course of conduct at the time of the policy-limits demand. Further, although McAleer could not represent that Jesus Camacho would definitely be appointed Administrator, the policy-limits demand accounts for that contingency by holding the settlement proceeds in trust. (McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 113.) While appointment was beyond the parties' control, Nationwide nevertheless could have "[met] the portion of the demand over which it ha[d] control, thus doing what it [could] to effectuate the settlement of the claims against its insured." *Brightman*, 580 S.E.2d at 522.[5] Indeed, when Nationwide belatedly made its settlement offer on June 9th that finally included the limited release, the company faced the same information deficits and incomplete Administrator appointment process that it says precluded it from responding by May 1st.

The Court therefore holds that McAleer's April 18 policy-limits demand when read in its entirety was a legally acceptable offer, susceptible to Nationwide's prompt response, and thus that settlement was possible. Accordingly, Nationwide is not entitled to judgment as a matter of law that it did not act in bad faith in failing to accept the demand based on impossibility of settlement.

### 3. Timing for Acceptance

■ Nationwide next contends that even if compromise was legally possible, Nationwide nonetheless lacked an opportunity to do so effectively. "In determining whether the insurer has breached its duty to its insured to settle, a factual issue is sometimes presented concerning whether the insurer had an opportunity to make an effective compromise." *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 580 S.E.2d 519, 521 (2003) (citing *Government Employees Ins. Co. v. Gingold*, 249 Ga. 156, 288 S.E.2d 557 (1982)). For example, an insurer "is not required to accept an offer which, under all the circumstances, imposes an unreasonably short period of time to respond." *Baker*, 747 S.E.2d at 9 (citing *Holt*, 416 S.E.2d at 274).

While normally a question for the jury, the Georgia Court of Appeals held as a matter of law in *Baker* that an "offer was made under circumstances which provided no reasonable settlement opportunity" when "[i]t was impossible under [the] circumstances for [the insurer] to obtain additional information needed to determine whether or not [the plaintiff's] impairment

---

**4.** Stacey Camacho's mother, LeJean Nichols, also a plaintiff in this action, was appointed instead.

**5.** This interpretation of the policy-limits demand dispenses with Nationwide's arguments that the offer required it to pay more than the policy limits, (Def.'s Br. MSJ 19–20, Doc. 76–

2 (citing *Baker*, 747 S.E.2d at 6)) that it would have left Nationwide's insured vulnerable to further claims, (*Id.* at 20) and that it was "purposefully crafted such that no reasonable insurer could or would have accepted the demand." (*Id.* at 21.)

had a value which justified tendering the ... policy limits." *Id.* at 8–9.

The parties disagree as to how long the demand was open,[6] but in either case, Nationwide contends that like the insurer in *Baker*, it lacked an effective opportunity to compromise. (Def.'s Br. MSJ 20, Doc. 76–2.) Nationwide bases this contention on the fact that "McAleer's demand did not include the marriage certificate and estate documents needed to verify that Jesus Camacho was the rightful claimant and to evaluate the claim. Furthermore, the demand letter did not address how to resolve any hospital liens and expressly prohibited addressing the same." (*Id.*) Nationwide argues that in this context, it did not have enough time to "ensure the settlement offer would adequately protect its insured." (*Id.*)

*Baker* does not control the instant case. Unlike the insurer in *Baker*, Nationwide knew for many months that Plaintiffs' claim exceeded the policy limits and had internally authorized payment to the limits of the policy approximately five months earlier. (Log at NW000282, Docs. 76–4 at 47, 96 at 44.) It also understood the parameters of Plaintiffs' settlement demand and insistence on a Limited Release several weeks prior to receipt of McAleer's letter of April 16th because of Wilson's phone communications with McAleer on March 28, 2006. (*Id.* at NW000266; Dep. Wilson II at 15, Doc. 89.) Under these circumstances, the Court cannot say as a matter of law that Nationwide did not have an effective opportunity to gather the infor-

mation necessary to settle, especially considering that it had already once made a full settlement offer in exchange for a general release. (Dep. LaJean Nichols, at 22, Def.'s MSJ App. F, Doc. 76–4, at 71; Dep. Wilson I, at 123, Doc. 83.) Further, a reasonable jury could find that the time window was irrelevant as Nationwide did not act promptly to settle the claim, instead waiting until May 1st even to initiate communication with Park regarding Plaintiffs' continuing insistence on a Limited Release. Finally, the record indicates that Nationwide based its refusal of the policy-limits demand principally on its objection to the demand's requirement of a Limited Release as opposed to any lack of information. (NW Letter to McAleer dated May 1, 2006, Def.'s MSJ App. O, Doc. 76–4, at 115.)

### 4. Best Interests of Insured

■■■■ The Court next examines if this objection was in the best interests of Nationwide's insured. Nationwide asserts as a matter of law that it did not act in bad faith in refusing to settle with Plaintiffs by putting its financial interests ahead of its insured. "Whether an insurance company acts in bad faith in refusing to settle depends on 'whether the insurance company acted reasonably in responding to a settlement offer,' bearing in mind that, in deciding whether to settle, the insurer must give the insured's interests the same consideration that it gives its own." *Fortner*, 686 S.E.2d at 94 (quoting *Brightman*, 580 S.E.2d at 519; *Holt*, 416 S.E.2d at 274). Nationwide argues that it put its insured's

---

**6.** Plaintiffs assert that the 10 day window called for in the policy demand was to be calculated from the date indicated on the letter (April 18), as "the letter requested that Nationwide 'evaluate this case and tender any payment within 10 days of today's date.'" (Pls.' Resp. MSJ 12, Doc. 99 (quoting McAleer Letter to NW dated Apr. 18, 2006, Def.'s MSJ App. N, Doc 76–4, at 110.).) Nationwide op-

erated on the assumption that it was 10 days from receipt, arguing that the letter did not specify otherwise. (Def.'s MSJ 18–19; Dep. Wilson II, at 22, Doc. 89.) The Court need not resolve this dispute because it is undisputed that the demand was not accepted, even using the broadest interpretation of a May 1, 2006 deadline.

"interests ahead of its own in trying to settle the claims for a general release" because "[a] general release provides greater protection to a tortfeasor that a limited liability release." (Def.'s Br. MSJ 23, Doc. 76–2.) Nationwide notes that a "limited liability release ... enables the claimant to file suit against the tortfeasor in order to pursue other applicable insurance, including uninsured/underinsured ("UM/UIM") motorist coverage and allows for the claimant's UM/UIM carrier to file a subrogation action against the tortfeasor." (Id.) On the other hand, "Nationwide received no benefit in requesting a general release over a limited liability release." (Id.)

▮ Nationwide may well be correct that in a broad sense, a general release is legally better for a tortfeasor than a limited release. However, that does not as a matter of law give Nationwide license to refuse any offer just because it believed it could potentially get a better offer for its insured on the basis (disputed at the time) that that UM/UIM coverage would not apply. See McCall v. Allstate Ins. Co., 251 Ga. 869, 310 S.E.2d 513, 515 (1984) ("[T]he insurer 'may not gamble' with the funds of its insured by refusing to settle within the policy limits."). (Log at NW000266, Docs. 76–4 at 47, 96 at 44; Dep. Wilson II at 15, Doc. 89.) [7]

Under the circumstances of this case, where Nationwide did not attempt to communicate with the insured regarding a Limited Release until May 1st, the jury must decide whether Nationwide's continued insistence on a General Release prior to June 9th was reasonable and in Mr.

Park's best interests. Accordingly, a reasonable jury could find that waiting until the last possible day before the policy-limits demand expired (under the broadest possible interpretation of the time demand) to begin inquiries regarding a Limited Release, which Nationwide's insured ultimately agreed to do without, was in bad faith. (Def.'s SMF ¶ 50, Doc. 76–1; Pls.' RSMF ¶ 50, Doc. 95–1.) In any case, "[t]he jury generally must decide whether the insurer, in view of the existing circumstances, has accorded the insured 'the same faithful consideration it gives its own interest.'" Holt, 416 S.E.2d at 276 (quoting Great Am. Ins. Co. v. Exum, 123 Ga. App. 515, 181 S.E.2d 704 (1971)). Nationwide has not met its burden of demonstrating that it is entitled to judgment as a matter of law.

In sum, Nationwide's Motion for Summary Judgment is **DENIED IN PART** to the extent it seeks summary judgment as to Plaintiffs' bad faith failure to settle claim. A jury must resolve the material disputes of fact in this case that bear directly on whether or not Defendant exercised bad faith in failing to settle Plaintiffs' underlying claims on a timely basis. While Defendant may persuade a jury that that it acted in good faith by the combination of its various types of settlement offers with its overall course of conduct, these are issues to be determined by the jury.

### 5. Negligence

▮ In addition to Plaintiffs' claims for excess liability due to Nationwide's alleged failure to settle in bad faith, Plain-

---

**7.** The Court does not hold that rejecting a limited release in circumstances where UM/UIM actions are likely, or even possible, can in no circumstances be reasonable as a matter of law. Cf. Gingold, 288 S.E.2d at 557, 559 (holding that an insurer "acted reasonably under the circumstances" when insisting on an indemnity clause in a settlement as the "insured might be held liable for contribution or indemnity if his only protection were a covenant not to sue.") Rather, it is a question of what is reasonable under the circumstances. See Holt, 416 S.E.2d at 276.

tiffs also assert that Nationwide "fail[ed] to handle the Camacho Claims with ordinary care." (Compl. ¶ 34, Doc. 1.) Nationwide argues in response that "improper claims handling is a breach of contract claim, not a tort claim," and thus Plaintiffs "have not stated a claim against Nationwide upon which relief can be granted." (Def.'s Br. MSJ 11, Doc. 76–2 (citing *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F.Supp.2d 1340, 1354 (N.D.Ga.2001)).) To the extent Plaintiffs allege negligent failure to settle, such allegations state claims upon which Georgia law provides relief. However, to the extent Plaintiffs allege negligence outside of the settlement context, such allegations are not supported by an independent duty in tort under Georgia law.

■ The Eleventh Circuit has recognized that "[u]nder Georgia law, a plaintiff may not sue in tort for a defendant's mere breach of a duty imposed by a[n insurance] contract." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545 (11th Cir.1991) (citing *Sheppard v. Yara Engineering Corp.*, 248 Ga. 147, 281 S.E.2d 586, 587 (1981)). "If, however, the defendant breaches a duty imposed by tort law independent of the contract to avoid harming the plaintiff, and the plaintiff sustains damages other than the loss of the benefit of the contract, the plaintiff may sue in tort. . . ." *Id.* (citing *Sheppard*, 281 S.E.2d at 586; *Davis v. Aetna Casualty & Surety Co.*, 169 Ga.App. 825, 314 S.E.2d 913, 918 (1984), *aff'd in part and rev'd in part*, 253 Ga. 376, 320 S.E.2d 368 (1984)) (internal citations omitted). One such extra-contractual duty imposed on insurers is the duty outlined above, not to "gamble with the funds of its insured by refusing to settle within the policy limits" in bad faith under certain circumstances. *Id.* at 1547 (quoting *McCall*, 310 S.E.2d at 515) (internal quotations omitted).

As the Eleventh Circuit recognized in *Delancy*, "Georgia law is ambiguous, however, as to whether an insured may recover for the insurer's negligent, as well as bad faith, failure to settle." *Id.* (comparing Georgia cases and recognizing a split in authority). Nonetheless, it noted that "the difference in the standards of negligence and bad faith may be only semantic." *Id.* at 1548 n. 26 (citing *U.S. Fid. & Guar. Co. v. Evans*, 116 Ga.App. 93, 156 S.E.2d 809 (1967), *aff'd* 223 Ga. 789, 158 S.E.2d 243 (1967) ("difference between bad faith and negligence is 'mere terminology' and 'means little' ") and Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv. L.Rev. 1136, 1140 (1954) ("The distinction between the 'bad faith rule' and the 'negligence rule' is less marked than these terms would suggest.")).

■ However, outside of this narrow context, Georgia law is clear that improper claims handling is a matter of contract, not tort. *Tate v. Aetna Cas. & Sur. Co.*, 149 Ga.App. 123, 253 S.E.2d 775, 776 (1979) (upholding summary judgment on the grounds that insured's claims were not supported by an independent duty in tort when insured alleged that insurer was negligent in, among other grounds, "violating accepted standards in the industry; in violating its own ethical standards; in using an unlicensed and incompetent adjuster and personnel").

Plaintiffs have alleged that Nationwide was negligent in its handling of and failure to settle Park's claim. To the extent that Plaintiffs' allegations of negligence specifically relate to settlement conduct, these allegations state a claim for which Georgia law grants relief. *See Delancy*, 947 F.2d at 1548. However, this claim would seek identical relief as Plaintiffs' bad faith claim and requires essentially identical proof. Accordingly, Plaintiffs' negligent failure to

settle claim is subsumed within their bad faith claim, on which the Court has denied summary judgment above.

However, Nationwide is correct that no independent duty to handle the claims with care exists in tort under Georgia law. *Tate,* 253 S.E.2d at 776. To the extent Plaintiffs seek relief due to such a breach,[8] such relief lies in contract, not tort. Accordingly, Nationwide's Motion for Summary Judgment is **GRANTED IN PART** as to these claims.

### 6. Failure to Notify

■ Plaintiffs argue that the duties insurers owe their insured rise to the level of fiduciary when "defending or settling a third-party claim on behalf of the insured" and thus under general principles of fiduciary law, insurers owe their insured a duty to communicate the receipt of an offer that would "substantially reduce or eliminate the insured's exposure to an excess judgment." (Pls.' Resp. MSJ 20, Doc. 99 (citing *State Farm Mut. Auto. Ins. Co. v. Smoot,* 381 F.2d 331, 333, 340–41 (5th Cir.1967) (noting that it was "[o]f great significance that the insured was not informed of settlement offers and refusals) and *Dawes Min. Co., Inc. v. Callahan,* 246 Ga. 531, 272 S.E.2d 267, 270 (1980) (describing fiduciary duties in the context of an employer-employee relationship)).)

The authorities Plaintiffs cite do not demonstrate an affirmative duty of insurers under Georgia law to notify their insured of any settlement opportunity. While evidence of Nationwide's failure to inform Park of settlement opportunities may be probative of Plaintiffs' claim for bad faith failure to settle, this failure is not in and of itself bad faith under Georgia law, Plaintiffs' citation to out-of-state authority notwithstanding. Accordingly, Nationwide's Motion for Summary Judgment is **GRANTED IN PART** as to claims by Plaintiffs that "Nationwide breached its good faith duty to inform Park of settlement opportunities within the policy limits," as a separate tort claim. (Compl. ¶ 34(e); Pls.' Resp. MSJ 20, Doc. 99.)

### 7. Attorney's Fees

The issue of Plaintiffs' entitlement to attorney's fees may not be resolved at this juncture of the proceedings and is therefore prematurely before the Court.

## B. Motion to Exclude Expert Witness

■ Nationwide seeks to exclude the testimony of Plaintiffs' expert Peter Knowe in its entirety on the grounds that his opinions concern legal questions to be determined by the Court, and his testimony is unreliable and therefore will not assist the trier of fact. Knowe's Rule 26 Report offers a host of opinions relating to Nationwide's claims handling conduct. Specifically, Nationwide challenges the following opinions offered by Mr. Knowe as impermissible legal conclusions that go to the ultimate issue in the case: (1) Nationwide rejected Plaintiffs' April 18, 2006 settlement offer; (2) Nationwide placed its own financial interest ahead of its insured with its decision to reject the specific terms of the settlement demand; (3) Nationwide intentionally hid its conduct from its insured. In addition, Nationwide chal-

---

**8.** *See, e.g.* Compl. ¶ 34(f) ("Negligently and carelessly adjusting and defending the Camacho Claims ...."), (g), (h) ("Failing to act reasonably and use that degree of care which is exercised by an ordinarily prudent insurer under the same or similar circumstances ...."), (m), (p) ("Failing to handle the entire claim in accordance with applicable laws, statutes, governmental and industry regulations that establish the obligations and standard of conduct for liability insurance companies handling claims, as well as NATIONWIDE's own policies.").

lenges as unreliable Mr. Knowe's opinions based on "generally accepted insurance standards" that: (1) Nationwide failed to properly supervise its adjuster; and (2) Nationwide breached the generally accepted standards for investigation of insurance claims.

 Federal Rule of Evidence 702 governs expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

District courts have broad discretion to determine the admissibility of expert evidence under Federal Rule of Evidence 702. *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir.1990). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court imposed on the trial courts a special gatekeeper role of ensuring that proffered expert testimony is both relevant and reliable before being admitted as evidence. 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir.1999). Accordingly, in determining the admissibility of expert testimony under Rule 702, the Eleventh Circuit has provided a rigorous three-part inquiry, instructing the trial courts to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as de-

termined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)). The proponent of expert testimony bears the burden to show that her expert is qualified to testify competently regarding the matters he intends to address, the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact. *Frazier*, 387 F.3d at 1260 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.2002)).

 While an expert may testify as to his opinion on an ultimate issue of fact he may not, however, merely tell the jury what result to reach. *Montgomery*, 898 F.2d at 1541 (citing Fed.R.Evid. 704, committee notes (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony). An expert may not testify regarding the legal implications of conduct because the court must be the jury's only source of law. *Id.; see also Plantation Pipeline Co. v. Cont'l Cas. Co.*, 1:0–CV–2811–WBH, 2008 WL 4737163 (N.D.Ga. July 31, 2008) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991) which held that "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.")); *Specht v. Jensen*, 853 F.2d 805, 807–10 (10th Cir. 1988) ("[T]estimony on the ultimate factual questions aids the jury in reaching a verdict; testimony which articulates and applies the relevant law, however, circumvents the jury's decision-making function

by telling it how to decide the case."). The line drawn by Rule 704 is a narrow one as explained by the Tenth Circuit in *Specht:*

> We do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

*Specht v. Jensen,* 853 F.2d at 809–10. An expert does not invade the court's authority by discoursing broadly over the entire range of the applicable law where the opinion is focused on a specific question of fact. *Id.* (citing *Huddleston v. Herman & Mac-Lean,* 640 F.2d 534, 552 (5th Cir.1981), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (attorney expert in securities law allowed to testify that a statement in a prospectus was standard language for the issuance of a new security because this information helped the jury weigh the evidence of defendants' scienter)).

Several courts have found that because the average juror is not likely to be familiar with the practices and procedures involved in insurance claims handling, expert testimony on these matters is admissible to assist the trier of fact. *See Noe v. Metro. Gen. Ins. Co.,* 1:11–CV–02026–SCJ, 2012 WL 7760143, *3 (N.D.Ga. Dec. 10, 2012) (Jones, J.); *Whiteside v. Infinity Cas. Ins. Co.,* 77 Fed.R.Evid. Serv. 289, 2008 WL 3456508, *8 (M.D.Ga. Aug. 8, 2008); *Kearney v. Auto–Owners Ins. Co.,* 2009 WL 3712343, *10 (M.D.Fla. Nov. 5, 2009) (rejecting insurance company's arguments that the facts at issue are not so complex as to warrant expert testimony); *cf. State Nat. Ins. Co. v. Access General Agency, Inc.,* 2007 WL 4563860,

*2 (N.D.Ga. Aug. 22, 2007) (Camp, J.) (admitting expert testimony regarding insurance company's response to time-limited demand for settlement even though the issues "are not necessarily complicated or complex matters beyond the understanding of the average juror, [as expert] testimony will assist the jury in understanding such matters as what documents an insurance adjustor might need to adjust a claim and how long an adjuster might take to assess and respond to a claim or demand for payment"). When "the substance of the expert's testimony concerns ordinary practices and customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's [testimony] in its entirety." *Kearney,* 2009 WL 3712343, at *10; *Travelers Indemnity Co. v. Royal Oak Enter. Inc.,* 2004 WL 3770571, *2 (M.D.Fla. Aug. 20, 2004). An insurance expert may testify regarding what duties are owed by an insurance company during the claims handling process and whether the actions of the insurance company complied with those duties without offering improper legal conclusions. *Kearney,* 2009 WL 3712343, at *10 (permitting experts to opine on "what ordinary and reasonable claims handling practices consist of and whether or not [an insurer] complied with those standards"); *Travelers Indemnity Co.,* 2004 WL 3770571, at *2 (finding that opinions as to the customs and practices of the insurance industry concerning insurance coverage determinations do not constitute legal opinions or conclusions of law).

As Plaintiffs correctly point out, expert testimony regarding an insurance professional's experience with the process-

ing of insurance claims and procedures for responding to demand letter is admissible and will assist the jury where the disputed issues concern whether the insurer "acted reasonably in not responding to the letter within the time limits imposed *on its face." State Nat. Ins. Co.*, 2007 WL 4563860, *2 (permitting Nationwide's expert in the case at bar, Peter Hildebrand, to testify as to what documents an insurance adjuster might need to adjust a claim and how long an adjuster might take to assess and respond to a claim and demand for payment) (emphasis added); *see also Kearney*, 2009 WL 3712343, at *10 (finding that "the appropriate timing of the payment [of policy limits] is a factual conclusion about which [an expert] may testify"); *Whiteside*, 77 Fed.R.Evid. Serv. 289, 2008 WL 3456508, *8 (permitting expert to testify as to the reasonableness of an insurer's claims handling practices but not as to what the law is or what result the jury should reach).

Nationwide concedes in its Reply that expert testimony can reference terms with legal significance without transforming the opinion into a legal conclusion. However, Nationwide objects to Knowe's opinion that Nationwide's conduct resulted in a "rejection" of Plaintiffs' settlement demand because whether the settlement demand was capable of acceptance is an issue of law to be decided by the Court. This objection is now moot as a result of this Court's ruling above. Whether Plaintiffs' settlement demand was rejected is not in dispute. Knowe may properly offer opinion testimony regarding the reasonableness of Nationwide's "rejection" of the settlement demand in accordance with insurance standards and practices, including whether Nationwide failed to take reasonable action to comply with the enumerated conditions of the settlement demand. *Kearney*, 2009 WL 3712343, at *10; *Whiteside*, 77 Fed.R.Evid. Serv. 289, 2008

WL 3456508, *8; *Travelers Indemnity Co.*, 2004 WL 3770571, *2.

■ Nationwide also objects to Knowe's opinion that Nationwide placed its own financial interest ahead of its insured when it rejected the settlement demand while it was pending on its face without first communicating with Mr. Park as to the terms and conditions of the demand. According to Nationwide, because one of the tests for determining bad faith is whether an insurance company gives equal consideration to the insured's interest as to its own interest, this opinion goes to the heart of the issue and instructs the jury to conclude that Nationwide acted in bad faith. However, Mr. Knowe's testimony will not be excluded as an impermissible legal conclusion merely because it overlaps with the language of a legal principle that may be explained by the Court. *See Kearney*, 2009 WL 3712343, at *10 (holding that expert opinion that insurer acted fairly and honestly toward insured with due regard for his interests was a factual conclusion and not inadmissible legal conclusion because it tracked the language of statute providing that an insured can bring a claim against an insurer for "not attempting in good faith to settle claims when, under all circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests.") Mr. Knowe may not, however, testify as to the ultimate issue in this case—whether Nationwide's conduct amounted to bad faith.

■ Nationwide also seeks to strike Mr. Knowe's opinions as unreliable because his opinions "rest on no methodology whatsoever and require this court to 'take his word for it' that his interpretations of Nationwide's actions are sound." Nationwide also cites to an order from the district court for the Eastern District of Loui-

siana excluding Mr. Knowe's opinions.[9] Plaintiffs respond that the Court can conclude Mr. Knowe's opinions are reliable (1) based on his specialized qualifications and experience in adjusting, investigating, and evaluating wrongful death claims in Georgia for twelve years, and (2) based on his extensive review of the case file and the model regulations from the National Association of Insurance Commissioners and Georgia's Unfair Claims Practices Act.

▮▮▮▮ As the district court aptly summarized in *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,*

> The Court, exercising its gatekeeping role in the admission of expert testimony, must ensure that admitted expert testimony is reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Standards of strict scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152, 119 S.Ct. 1167.

*Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,* 248 F.R.D. 298, 303 (N.D.Ga. 2008) *aff'd,* 555 F.3d 1331 (11th Cir.2009). In determining whether any expert's testimony is sufficiently reliable, the Court may "focus upon personal knowledge or experience." *Id.* (citing *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167); *Whiteside,* 77 Fed. R.Evid. Serv. 289, 2008 WL 3456508, *8 (finding that expert's knowledge and practical experience regarding claims handling issues rendered his testimony sufficiently

reliable to withstand scrutiny under the second *Daubert* prong).

Nationwide does not dispute that an expert may rely on personal knowledge or expertise in forming his opinions, but asserts that "Knowe's testimony fails to elucidate *how* his knowledge or expertise forms the basis for his opinions." Prior to becoming self-employed as a litigation consultant, Mr. Knowe was employed by Aetna Casualty and Surety (Aetna) and Infinity Insurance Group (Infinity). Mr. Knowe was employed with Aetna for 12 years as an insurance claims adjuster and senior technical representative assisting with the resolution of complex litigation including bad faith claims and as an auditor of proper claims handling under industry standards. Mr. Knowe worked as a manager in Infinity's corporate litigation department for 15 years where he was responsible for the nationwide evaluation of bad faith litigation, served as Infinity's company's 30(b)(6) trial witness, developed and wrote company best practices for claims handling to meet insurance standards, taught claims handling practices to field staff, directed company compliance for claims handling, and developed a library for bad faith, good faith and fair dealing handling of claims, among other duties. In 2006, Mr. Knowe started Knowe Consulting, LLC where he has provided exert testimony and evaluation of insurance litigation nationwide for insurance carriers and individuals in both state and federal courts. In the last four years, Mr. Knowe has been retained as an expert in over 60 cases and has testified as an expert in 30 trials. Based on this and the other information provided in Mr. Knowe's report, the Court finds that Mr. Knowe is suffi-

---

**9.** The Court cannot place much weight on the decision in *Imperial Trading Co., Inc. v. Travelers Property Cas. Co.,* 654 F.Supp.2d 518

(E.D.La.2009) without knowing how the report in that case substantively compares to Knowe's report in this case.

ciently qualified to testify as an expert in this matter.

██ Nationwide objects to Mr. Knowe's opinions based on "generally accepted insurance standards of good faith and fair dealing for the handling of insurance claims in Georgia" because he fails to explain (1) what the generally accepted industry standards are and (2) how industry practice and guidelines inform his opinions. Specifically, Nationwide challenges Knowe's opinion that Nationwide failed to properly supervise its adjuster without identifying the industry standard for supervision and/or how Nationwide allegedly fell short of that standard. In the section of his report entitled "Supervision," Mr. Knowe's Rule 26 Report states as follows:

(a) Carriers owe a duty to the insured to settle all reasonable settlement demands within the policy limits and must meet the reasonable conditions of the demand to fully protect the personal assets of the insured;

(b) Nationwide was responsible for proper training of its claims adjuster and breached industry custom and practice requiring proper training and supervision;

(c) Nationwide rejected the settlement demand by failing to meet the conditions of the offer without a reasonable basis during the time period the demand was open;

(d) Nationwide was responsible for providing the proper training and supervision of the handling adjuster who failed to properly respond and accept the conditional demand for policy limits in this excess claim;

(e) Nationwide failed to properly supervise this adjuster and failed to provide direction to allow the acceptance of the demand despite Nationwide knowledge of potential excess exposure (beyond the policy limits);

(f) The handling adjuster provided no testimony regarding what direction she was given by her supervisor or past training or her authority level to negotiate liability claims of this magnitude.

Although Mr. Knowe does not cite a specific reference manual or other publication for each of the specific industry standards cited in his Rule 26 Report, Mr. Knowe enumerated the documents and materials relied on to support his opinions including "documents pertaining to the standards, practices and procedures in the insurance industry, including insurance industry materials, copies of statutory and regulatory provisions pertaining to insurance, good faith and bad faith case law and appellate decisions, and leading insurance industry articles and publications." Included among these reference materials, Mr. Knowe indicates that he reviewed the National Association of Insurance Commissioners–Unfair Claims Settlement Practices Act—Model Regulation 900 and the National Association of Insurance Commissioners–Unfair Property/Casualty Claims Settlement Practices—Model Regulation 902. The Court finds that Mr. Knowe's knowledge, experience, and reliance on these industry standards form the basis for the opinions he offers in this case. *Noe v. Metro. Gen. Ins. Co.*, 1:11–CV–02026–SCJ, 2012 WL 7760143, *3 (N.D.Ga. Dec. 10, 2012) (Jones, J.) (rejecting insurer's argument that expert's methodology was flawed because it does not specifically highlight which outside sources validate his opinion because such a level of specificity is not required to show the opinion is reliable). While Nationwide may disagree with Mr. Knowe's opinions and may address deficiencies in those opinions on cross-examination, the Court cannot find

that Mr. Knowe failed to provide a basis for his opinion that the adjuster was not properly trained and supervised in accordance with insurance industry custom, practice, and standards. *See, e.g., Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir.1988) (holding that expert testimony is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation and noting that weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility); *Noe*, 2012 WL 7760143, *3 (finding expert testimony that "[i]ndustry best practices" establish that "[a]t no time should the adjuster make a counter offer, effectively rejecting the policy/time limit demand, unless the adjuster has all information necessary to complete the evaluation of the claim" to be sufficiently reliable).

 Nationwide further objects to Knowe's opinion that Nationwide's "investigation was untimely, insufficient, and inadequately determined the reasonable conditions to accept a demand within the policy limits prior to rejecting a demand within the policy limits" and that "Nationwide breached the duty to timely and fairly investigate the settlement opportunity of this claim without reason." According to Nationwide, Knowe failed to cite any facts in support of his conclusion or to identify which aspects of Nationwide's investigation were untimely or insufficient. In his Rule 26 Report, Knowe opines that Nationwide correctly offered the available policy limits of $100,000 on or about March 28, 2006 to Plaintiffs' counsel but that Nationwide owed a "continued duty to settle this claim beyond the offer of policy limits and all carriers must continue to investigate settlement to protect the insured." Knowe notes that Nationwide received the April 18, 2006 settlement demand on or about April 20, 2006 *with* three conditions, specifically that the Plaintiffs would only accept a "limited release as provided in O.C.G.A. 33–24–41.1." According to Knowe's report, the conditions were neither "confusing nor complex per industry standards for a catastrophic injury which resulted in death" and that the condition of a limited release is "routinely handled by the insurance industry in settling claims in Georgia." Knowe further notes that the following additional "facts" supporting his opinion (among others) that Nationwide's investigation into the settlement conditions were untimely and unreasonable per industry custom and practice:

(a) There was no evidence of any delay or action by the Plaintiffs' attorney which was an impediment to settlement of the claim pursuant to the terms of the written offer within the policy limits;

(b) Nationwide had notice of Plaintiffs' intent to ask for a limited liability release as early as March 28, 2006 per Nationwide's claims file log;

(c) Nationwide raised no objections to the settlement demand while it was open and failed to request additional time to meet the conditions;

(d) Nationwide management failed to give the handling adjuster any instruction regarding acceptance of the conditions and the claims log fails to show any effort by the adjuster to seek internal assistance to comply with the terms of the demand or external legal review prior to rejection of the settlement opportunity;

(e) Nationwide failed to note the deadline for the time-limit demand;

(f) Nationwide failed to communicate with its insured regarding the limited liability release condition while the demand was open;

(g) Nationwide was aware of aggravating circumstances likely to increase the damages award, such as the imposition of a DUI and resulting criminal charges against its insured related to the accident.

Accordingly, the Court cannot conclude based on this record that Mr. Knowe failed to provide a factual basis his opinions that Nationwide's investigation into the settlement opportunity was untimely and insufficient. Again, the Court notes that Nationwide may ferret out any weaknesses in Knowe's opinions to ensure the jury properly evaluates the testimony's weight and credibility. *Jones v. Otis Elevator Co.,* 861 F.2d at 663 (finding that as a logical basis exists for an expert's opinion and the inadequacies are fully disclosed to the jury, the weaknesses in the underpinnings of the opinion, go to the weight and not the admissibility of the testimony). For these reasons, the court **DENIES** Nationwide's Motion to Exclude Witness Report and Testimony of Peter Knowe [Doc. 77].

## IV. CONCLUSION

For the foregoing reasons, Defendant Nationwide's Motion for Summary Judgment [Doc. 76] is **GRANTED IN PART** and **DENIED IN PART,** and Nationwide's Motion to Exclude Expert Witness [Doc. 77] is **DENIED.**

The parties are **DIRECTED** to engage in mediation of this matter. The parties may mutually agree upon a private mediator or if unable to reach an agreement, the Court will appoint a private mediator from a list of three mediators to be provided to the parties. The parties should notify the Court within ten (10) days if they are unable to agree upon a mediator. The mediation in this matter must be completed within fifty (50) days of the entry of this Order. In the event the parties fail to reach an agreement, they **SHALL** submit their proposed Consolidated Pretrial Order within twenty (20) days of the conclusion of the mediation.